## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Asli Jama,                                    File No. 23-CV-02291 (JMB/ECW)

       Plaintiff,

v.

                                     **ORDER**

Berkshire Hathaway Homestate Insurance
Company,

       Defendant.

---

Jeremy L. Brantingham, Brantingham Law Office, PA, Minneapolis, MN, for Plaintiff Asli Jama.

Dawn L. Gagne and Kevin F. Gray, Rajkowski Hansmeier Ltd., St. Cloud, MN, for Defendant Berkshire Hathaway Homestate Insurance Company.

---

This matter is before the Court on Defendant Berkshire Hathaway Homestate Insurance Company's (Berkshire Hathaway) motion for summary judgment. (Doc. No. 30.) For the reasons explained below, the Court grants the motion.

### STATEMENT OF UNDISPUTED FACTS

This focus of this case and motion is whether Jama's employer's auto-insurance policy with Berkshire Hathaway—specifically, its uninsured and underinsured motorist policy—covers the injuries she sustained when she was struck by a hit-and-run vehicle when she was near but not inside of the employer's minivan.

### A.    The Insurance Policy

Jama's employer's minivan was covered by an insurance policy issued by Berkshire

Hathaway to the employer.  (*See* Doc. No. 3-1.)  The policy provides coverage for uninsured and underinsured motorist incidents.  (*Id.* at 29.)  The uninsured and underinsured motorist provisions (Policy) apply when an insured sustains bodily injury caused by an underinsured or uninsured motorist.[1]  (*See id.* at 29.)  The Policy covers injured individuals insofar as the individual meets the Policy's definition of an "insured." (Doc. No. 3-1.)  To that end, the Policy defines an "insured" as the named insured as well as the following persons:

> a. Anyone "occupying" a covered "auto" [i.e., the minivan][; or]
>
> b. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured[.]"

(*Id.* at 30 ¶ B.2.)  In other words, an insured is someone who is "occupying" the minivan, or someone who is injured by someone "occupying" the minivan.  (*See id.*)  Under the Policy, "'[o]ccupying' means in, upon, getting in, on, out or off."  (*Id.* at 33 ¶ F.2.)

## B.    The Accident

On July 7, 2020, Jama drove and parked her employer's minivan across the street from a market on Nicollet Avenue South in Minneapolis.  (Doc. No. 32 at 8:20–9:4; 12:23–13:4, 14:21–25, 16:17–19, 19:4–14.)  The market is on the west side of Nicollet Avenue South and Jama parked the minivan facing north on the east side of the street.

After shopping, Jama exited the market and attempted to cross the street to return to the minivan.  (*Id.* at 19:4–14.)  While doing so, she was struck by a hit-and-run driver.

---

[1] The parties agree that a hit-and-run driver qualifies as an "uninsured" or "underinsured" motorist.  (*See* Doc. Nos. 33, 40.)

2

(Doc. No. 34 ¶ 3.)  Jama testified that she was unable to stand up after she was struck, and moved only after first responders arrived to render assistance.  (Doc. No. 32 at 18:18–25.) She suffered a broken foot and bruising on her left side.  (*Id.* at 53:20–54:23.)  A police report made by responding officers describes statements made by Jama to them, as follows:

> [Jama] said she was crossing the street from the west side of the street to the east side.  The [hit-and-run] vehicle was [southbound] on Nicollet, struck [Jama] on the left side of her hip knocking her to the ground where she landed on the right side of her hip and elbow.

(Doc. No. 32 at 29; *see also* Doc. No. 3-2 at 4.)

An eyewitness to the accident avers that Jama was "crossing the street with a bag of groceries when she was hit by a white car."  (Doc. No. 34 ¶ 3.)  She further avers that Jama "was not getting into a vehicle" and "was not next to a parked vehicle" when she was hit; rather, she was hit "in the middle of the street."  (*Id.* ¶¶ 4, 5.)  An EMS first responder recalls that, upon arrival to the scene, Jama was "sitting in the middle of Nicollet Avenue next to a white plastic bag of food items that had spilled onto the street," and that she "was not near any parked vehicle."  (Doc. No. 36 ¶ 4; *see also id.* ¶¶ 5–7.)  Also, a Minneapolis Police Officer who reported to the scene observed Jama "sitting in the middle of the street holding her foot."  (Doc. No. 35 ¶ 2.)  The officer also observed that the minivan "was some distance away from [her]."  (*Id.* ¶ 7.)  Photos captured from responding officers' body-worn cameras show first responders treating Jama, who is laying along the double-yellow line on Nicollet Avenue, several yards from the minivan.  (*Id.* ¶ 6.)

For her part, Jama acknowledged that she was in shock after the accident and did not remember certain facts, but she was certain that she was not inside of the minivan when

she was hit by the hit-and-run vehicle. (Doc. No. 32 at 19:1–2, 30:20–21, 44:13–16.) Jama made varying statements about where she was when she was hit including that she was "standing next to [her] vehicle" (*id.* at 16:21), she was "getting into [her] car" (*id.* at 20:17), she was "was close to" and "trying to go inside" of the minivan (*id.* at 30:15–17, 39:1), she "was leaning on" the minivan (*id.* at 32:3), she was "trying to open the vehicle's door" (*id.* at 15:12, 31:23), she was "pushed out of [her] vehicle" by the impact of the hit (*id.* at 15:24), she was flung "underneath of [her] vehicle" by the impact (*id.* at 17:17), and "the middle of the street" is "where [she] had the accident." (*Id.* at 41:19–22.)

**C.    This Action**

In late July 2023, Jama commenced this lawsuit. (Doc. Nos. 1, 1-1.) In her Complaint, Jama seeks a declaratory judgment that the injuries she sustained during the accident are covered by the Policy. (Doc. No. 1-1.)

**DISCUSSION**

Berkshire Hathaway now moves for summary judgment on grounds that Jama did not "occupy" the minivan and therefore was not an "insured" under the Policy. (Doc. Nos. 30, 33.) The parties disagree regarding a legal issue—whether the policy definitions or a Minnesota statute apply—as well as regarding whether the record contains any genuine factual disputes.

Summary judgment is warranted if there is no genuine dispute as to any material fact or the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Anderson v.*

4

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), a "genuine" dispute of material fact only exists if "a reasonable jury could return a verdict for either party." *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (reversing denial of summary judgment because the district court "rel[ied] on such visible fiction" where the video evidence clearly favored the moving party); *see also, e.g.*, *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (reversing denial of summary judgment because video evidence "clearly contradicts the version of the story told by [non-moving party]"); *O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007) (observing that summary judgment is proper when "no reasonable jury could believe" the non-moving party's view of the facts) (quotation omitted).

The Court first addresses the applicability of the Policy definitions and declines to adopt Jama's legal argument. Next, the Court examines the record and concludes that summary judgment is appropriate because no reasonable juror could find in Jama's favor.

## I.    APPLIABILITY OF POLICY DEFINITIONS

Berkshire Hathaway argues that the Policy's language determines whether Jama is entitled to coverage. Jama disagrees. She argues that the language of Minnesota's No-Fault Insurance statute, not the Policy language, controls.[2] (Doc. No. 40 at 4–8 (citing

---

[2] The implied premise of this argument appears to be that the Policy language is in conflict with the requirements of the No-Fault statute.

Minn. Stat. § 65B.47, subd. 1).)   As discussed below, the Court agrees with Berkshire Hathaway and concludes that the policy definitions control.

The Minnesota No-Fault statute's uninsured and underinsured motorist provision provides that "[a]n insured may recover basic economic benefits under Minnesota's no-fault insurance plan if (1) the insured suffers an 'accident causing injury;' and (2) the injury arises out of the 'maintenance or use of a motor vehicle.'" *Medicine Lake Bus Co. v. Smith*, 554 N.W.2d 623, 624 (Minn. 1996) (quoting Minn. Stat. §§ 65B.46, subd. 1, 65B.44, subd. 1).   The statute defines "maintenance or use of a motor vehicle" as including "occupying, entering into, and alighting from it."  Minn. Stat. § 65B.43, subd. 3.  An insurer's liability is determined by the insurance policy "as long as th[e] insurance policy does not omit coverage required by law and does not violate applicable statutes." *Kelly v. State Farm Mut. Ins. Co.*, 666 N.W.2d 328, 331 (Minn. 2003).

Jama argues that *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741 (Minn. 2005) controls.  In *Dougherty*, an intoxicated insured became stuck in a snowdrift when driving home from a bar on a bitterly cold night.  *Id.* at 742.  The insured exited the car and attempted to walk the remaining 330 feet to her home.  *Id.*  It took the insured at least 30 minutes to do so because of icy conditions.  *Id.*  During that time, the insured sustained severe frostbite, requiring amputation of several fingers.  *Id.*  The insurer denied coverage on grounds that the insured's injuries were not the result of her "use or maintenance" of her vehicle under Minnesota Statutes section 65B.46.  *Id.* at 742–43.  The Minnesota Supreme Court ruled otherwise, concluding that her injuries were a "natural and reasonable incident or consequence" of using a vehicle in Minnesota in the winter.  *Id.* at 746.

6

According to Jama's interpretation of *Dougherty*, Jama is entitled to coverage because being hit by a car while crossing a street to enter a vehicle is a natural and reasonable incident or consequence of the use or maintenance of a vehicle. Berkshire Hathaway disagrees and argues that *Dougherty* is distinguishable because the plaintiff was undisputedly the insured under the relevant policy; whereas here, the question is whether Jama is an "insured" under her employer's policy at all.

The implied premise of Jama's argument is that, under the uninsured-motorist provision of Minnesota's No-Fault statue, *any* person using or maintaining a motor vehicle is an insured. *Daugherty*, however, does not extend quite so far. The statutory language, on its face, applies only to *insureds* as defined in a relevant policy; it does not change the definition of who is insured under a particular policy. Minn. Stat. § 65B.49, subd. 3a(5) ("If at the time of the accident the injured person is occupying a motor vehicle, the limit of liability for uninsured and underinsured motorist coverages available to the injured person is the limit specified for that motor vehicle."); *Kelly*, 666 N.W.2d at 331 (providing that underinsured motorist coverage under Minnesota's No-Fault statute is meant "to protect the named insured and other additional insureds from suffering an inadequately compensated injury caused by an accident with an inadequately insured automobile") (quotation omitted). For example, in *Gieser v. Home Indem. Co.*, 484 N.W.2d 256 (Minn. App. 1992), a police officer, Gieser, was struck and injured by a passing car while he was 30–150 feet away from his squad car, directing traffic. *Id.* at 257. Gieser sought a declaration that he was eligible for underinsured motorist coverage under a policy that covered his employer's vehicle. *Id.* at 256–57. That policy covered "anyone occupying"

7

the vehicle, and defined "occupying" as "in, upon, getting in, on, out or off." *Id.* at 257. The Minnesota Court of Appeals determined that the policy's definition of "insured" "does not conflict with the [No-Fault] statute" and advised that "[t]here is no statutory or public policy basis to expand coverage not required and not contracted for." *Id.* at 257. The Court ultimately concluded Gieser was not "insured" under the policy.

Therefore, the Court is not convinced by Jama's argument that the Policy's definition of "insured" can and should be overlooked in favor of statutory language. Jama is entitled to coverage under the Policy only if she "occupied" the minivan (i.e., only if she is an "insured") at the time she was struck by the hit-and-run vehicle.[3]

## II.    RECORD PRESENTED REGARDING WHETHER JAMA "OCCUPIED" THE MINIVAN

The parties have different views about whether Jama "occupied" the minivan (i.e., was an insured) at the time she was struck by the hit-and-run vehicle. Again, as discussed below, the Court agrees with Berkshire Hathaway and concludes that, even when viewed in the light most favorable to Jama, no reasonable juror could find that she occupied the minivan at the time of the accident.

Jama does not argue that the Policy's language—specifically, its use of the term "occupying"—is ambiguous. Therefore, the Court gives effect to the plain meaning of the

---

[3] The parties do not dispute the meaning or effect of the Policy definitions. They only dispute whether the record contains any disputed factual issues concerning whether Jama "occupied" the minivan.

policy's use of "occupying."[4]  Under Minnesota law, the plain meaning of "occupying" does not cover someone who is near, but not in the act of getting in or out of, an employer's vehicle.  *See, e.g., Short*, 602 N.W.2d at 916 (concluding that a tow-truck driver who was struck by a car as he was returning to the rear of his truck after loading a vehicle was not "occupying" the tow truck and was therefore not an insured under the employer's underinsured policy); *Gieser*, 484 N.W.2d at 258 (concluding that a police officer did not "occupy" vehicle when standing outside of it, and was therefore not insured under the employer's underinsured policy); *see also Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 983, 988 (D. Minn. 2012) (concluding that persons struck by a car who were standing immediately next to, but who were "not physically placing themselves within the car's confines," did not "occupy" a vehicle); *Allied Mut. Ins. Co. v. W. Nat. Mut. Ins. Co.*, 552 N.W.2d 561, 563 (Minn. 1996) (concluding that a plaintiff who was injured while standing near a vehicle waiting for the door to unlock was not "occupying" the vehicle); *Ostendorf v. Arrow Ins. Co.*, 182 N.W.2d 190, 191, 192 (Minn. 1970) (concluding that the daughter of an insured who was injured while crossing to street to get to the vehicle was not "occupying" the vehicle).  The Minnesota Supreme Court declined to extend "occupy" to include people within a "geographic perimeter" of the vehicle.  *Allied*, 552 N.W.2d at 563.

---

[4] State law governs the interpretation of insurance policies.  *E.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003).  In Minnesota, "the interpretation of insurance contract language is a question of law as applied to the facts presented."  *Short v. Midwest Fam. Mut. Ins. Co.*, 602 N.W.2d 914, 916 (Minn. App. 1994) (quotation omitted); *see also Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) (advising that "insurance polic[ies] must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning" (quotation omitted)).

Jama insists that the record is at least disputed whether she "occupied" the minivan at the time she was hit. In doing so, she relies solely on her own testimony to establish that she was "near," "close to," and attempting to open the door of the minivan when she was struck. Berkshire Hathaway, for its part, supports its assertion otherwise with three affidavits (two from first responders who reported to the scene and one from an eyewitness who did not know Jama[5]) and a police report[6] that consistently contradict Jama's conflicting accounts and support its position that Jama did not "occupy" the minivan—and was instead in the middle of the road—when she was hit.

As noted above, a "genuine" dispute of material fact exists only if "a reasonable jury could return a verdict for either party." *Peter*, 155 F.3d at 996. Here, the dispute about where Jama was at the time she was struck by the hit-and-run driver is not "genuine" because it is "blatantly contradicted by the record," including by Jama's own internally inconsistent testimony. *Scott*, 550 U.S. at 380. The eyewitness to the accident stated that the accident occurred in the "middle of the street," while Jama was "crossing the street with a bag of groceries," and that Jama "was not getting into the vehicle" and "was not next to a parked vehicle" when she was hit. (Doc. No. 34 ¶¶ 3–5.) In addition, photographs from the responding officer's body-worn camera corroborate the eye witness's statement

---

[5] Jama testified that she did not know the eyewitness. (Doc. No. 32 at 49:18–19.)

[6] Jama does not challenge the credibility or veracity of these documents. In fact, Jama herself "would rely on the police report" because she "d[id]n't think the police would lie about what happened." (Doc. No. 32 at 44:20–21; *see also id.* at 48:12–15.) Further, when Jama did not recall facts about the accident, she testified that the deposing attorney should "ask the police" and that "the police know what happened." (*See id.* at 43:10; 48:12–13.)

by showing that, when first responders arrived, Jama was in the middle of the road. (Doc. No. 36 ¶¶ 4–7; Doc. No. 35 ¶¶ 2, 6). This is also consistent with the portion of Jama's testimony in which she stated that she could not move after she was struck, and she moved only after first responders rendered assistance. (Doc. No. 32 at 18:18–25.) One first responder also noted that Jama was "sitting in the middle of Nicollet Avenue" and that she "was not near any parked vehicle." (Doc. No. 36 ¶ 4; *see also id.* ¶¶ 5–7.) Likewise, the police officer observed that the minivan "was some distance away from [her]." (Doc. No. 35 ¶ 7.)

Against this evidence, the Court considers Jama's conflicting accounts about where she was standing (Doc. No. 32 at 16:21, 20:17, 30:15–17, 39:1, 32:3, 15:12, 31:23, 41:19–21 (providing varying accounts of where she was standing and what she was doing)) and that the impact either "pushed [her] out of [her] vehicle" (*id.* at 15:24) or flung her "underneath of [her] vehicle." (*Id.* at 17:17.) Jama also acknowledged that she was in shock after the accident and did not remember certain facts. (*Id.* at 19:1–2, 30:20–21, 44:13–16.)

No reasonable juror would disbelieve the photographic evidence and the testimony of the eyewitness, police officer, and medical responder in favor of Jama's conflicting recollection of events. Therefore, the Court can identify no genuine dispute of material fact, and the record presented compels only one reasonable conclusion for the fact finder to reach: Jama was not "occupying" the minivan at the time of the accident, and, therefore, is not an "insured" under the Policy. The Court grants Berkshire Hathaway's motion for summary judgment.

11

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT

IS HEREBY ORDERED THAT:

1.    Defendant Berkshire Hathaway Homestate Insurance Company's motion for summary judgment (Doc. No. 30) is GRANTED.

2.    Jama's claims are DISMISSED WITH PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  July 8, 2025                                    /s/ *Jeffrey M. Bryan*
                                                         Judge Jeffrey M. Bryan
                                                         United States District Court